# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GENESEE COUNTY EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>    *Plaintiff*,<br><br>  vs.<br><br>BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; BARCLAYS PLC; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BNP PARIBAS, S.A.; BNP PARIBAS SECURITIES CORP.; CITIGROUP, INC.; CITIBANK N.A.; CITIGROUP GLOBAL MARKETS INC.; CITIGROUP GLOBAL MARKETS LIMITED; CREDIT SUISSE AG; CREDIT SUISSE GROUP AG; CREDIT SUISSE SECURITIES (USA) LLC; CREDIT SUISSE INTERNATIONAL; DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES INC.; THE GOLDMAN SACHS GROUP, INC.; GOLDMAN SACHS & CO.; GOLDMAN SACHS BANK USA; GOLDMAN SACHS FINANCIAL MARKETS, L.P.; GOLDMAN SACHS INTERNATIONAL; HSBC BANK PLC; HSBC BANK USA, N.A.; HSBC SECURITIES (USA) INC.; ICAP CAPITAL MARKETS LLC; J.P. MORGAN CHASE & CO.; J.P. MORGAN CHASE BANK, N.A.; J.P. MORGAN SECURITIES LLC; J.P. MORGAN SECURITIES PLC; MORGAN STANLEY; MORGAN STANLEY BANK, N.A.; MORGAN STANLEY & CO. LLC; MORGAN STANLEY CAPITAL SERVICES LLC; MORGAN STANLEY DERIVATIVE PRODUCTS INC.; MORGAN STANLEY & CO. INTERNATIONAL PLC; MORGAN STANLEY BANK INTERNATIONAL LIMITED; THE ROYAL BANK OF SCOTLAND GROUP PLC; ROYAL BANK OF SCOTLAND PLC; RBS SECURITIES INC.; TRADEWEB MARKETS LLC; UBS AG; and UBS SECURITIES LLC,<br><br>    *Defendants*. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Genesee County Employees' Retirement System, on behalf of itself and all others similarly situated, brings this class action for violations of the Sherman Act, Clayton Act, and state common law against Defendants. Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.      This action arises from Defendants' conspiracy to block the development of exchange-traded platforms for the trading of interest rate swaps ("IR swaps"). Defendants are the major dealers in the IR swaps market (the "Dealer Defendants") and entities controlled by the Dealer Defendants (together, "Defendants").

2.      The most common type of IR swap is an agreement between two parties to exchange interest-rate cash flows on a specific notional amount of principal for a fixed period of time. In these "plain vanilla" IR swaps, one party pays a fixed interest rate to a receiving counterparty who, in return, pays a floating interest rate based on a benchmark. This arrangement permits an investor to mitigate the risk of changes in interest rates or to speculate on the future movement of interest rates.

3.      IR swaps are an important financial tool used by an array of investors in the United States and elsewhere. IR swaps allow investors, including Plaintiff and other pension funds, asset managers, corporations, and municipalities, to manage risk and protect themselves from movements in interest rates. These entities typically are called "buy-side investors." By contrast, major dealers of these products, like the Dealer Defendants, act as "market-makers," meaning that they stand ready to take either the fixed or floating rate obligation of an IR swap.

4.      IR swaps comprise one of the largest financial markets with billions of dollars in swaps traded each day. Over the past decade, many IR swaps have become standardized

instruments and thus readily suited for anonymous, exchange-like trading that would bring greater price competition and transparency to buy-side investors. Yet buy-side investors remain stuck trading IR swaps in the over-the-counter ("OTC") market, an inefficient and antiquated market dominated by the Dealer Defendants.

5.      Historically, in the OTC market, investors submitted a request for a quote ("RFQ") from one or more of the Dealer Defendants. While investors could obtain buy ("bid") and sell ("ask") quotes from multiple dealers, they could only negotiate a final price one dealer at a time. This inefficient form of trading does not allow for competitive price shopping by customers. As a result, bid-ask spreads in the dealer-to-customer ("D2C") segment remained considerably wider and less competitive than bid-ask spreads seen in equity or commodities markets, both of which are subject to extensive exchange-trading.

6.      In contrast to the OTC trading in the D2C segment, the Dealer Defendants trade IR swaps *with each other* on electronic, exchange-like platforms. Exchange-trading of IR swaps in the dealer-to-dealer ("D2D") segment enabled the Dealer Defendants to trade at comparatively tighter bid-ask spreads than that observed in the D2C segment. As a result, during the Class Period, the IR swaps market was effectively bifurcated: the D2D segment traded IR swaps at tighter, more competitive bid-ask spreads, while the D2C segment traded at wider, less competitive bid-ask spreads.

7.      This bifurcation was not the result of competitive dynamics within the IR swaps market or historical accident—it was the result of a conspiracy among the Dealer Defendants to work together to maintain the bifurcated market for trading IR swaps and to ensure that they were the only ones allowed to trade IR swaps on these platforms. Since at least 2008, the Dealer Defendants have jointly threatened, boycotted, coerced, or otherwise eliminated any entity or

practice that had the potential to bring the benefits of exchange trading to buy-side investors in the IR swaps market.

8.      The Dealer Defendants also conscripted others to join their conspiracy. For example, Defendant Tradeweb—the electronic trading services company jointly owned and controlled by the Dealer Defendants—agreed with the Dealer Defendants, against its own economic self-interest, to shutter the possibility of offering buy-side investors access to competitive IR swaps trading, and to forego the lucrative brokerage fees that would come from facilitating such transactions. The same was true of Defendant ICAP, the largest interdealer broker in the IR swaps market, which also shuttered a nascent plan to develop all-to-all, anonymous IR swaps trading—*i.e.*, a platform that would allow both dealers and buy-side investors to trade anonymously.

9.      The Dealer Defendants also boycotted certain Swap Execution Facilities ("SEFs") that favored all-to-all anonymous trading of IR swaps. Regulators and industry stakeholders envisioned SEFs to be exchange-like platforms that would allow buy-side investors to trade on an all-to-all central limit order book ("CLOB")—*i.e.*, an electronic trading platform where participants can: (1) see bid and ask prices from other market participants in real-time; (2) submit bids and offers; and (3) have their orders automatically matched against the best available bid or ask price. Indeed, the Dodd-Frank Wall Street Reform Act ("Dodd-Frank") required certain IR swaps to be traded through SEFs.

10.     Realizing that the emergence of all-to-all SEFs could jeopardize their ability to profit from pricing opacity in the OTC market, the Dealer Defendants sought to upend the spirit of Dodd-Frank by either coercing SEFs into helping them maintain the bifurcated market or putting them out of business entirely. In particular, the Dealer Defendants worked together to

shut down three SEFs—Javelin Capital Markets LLC ("Javelin"), TeraExchange Inc. ("TeraExchange"), and TrueEX Group LLC ("TrueEX"). These market entrants spent millions of dollars and invested years of resources in an effort to "loosen[] the stranglehold that the [Dealer Defendants] have on the multi-trillion dollar [IR swaps] market."[1] But these entrants were unsuccessful because the Dealer Defendants agreed to boycott their participation on any of these platforms.

11.     In addition to these group boycotts, the Dealer Defendants worked together to police their conspiracy and to ensure that end users are unable to use exchange-like trading platforms. For instance, the Dealer Defendants have refused to clear transactions for end users who participate in SEFs like Javelin, TeraExchange, or TrueEx.

12.     The Dealer Defendants also forced exchanges in which they participated to employ a practice known as "name give-up." Name give-up requires the disclosure of the identity of each swap counterparty to the other on every trade. There is no pro-competitive reason for name give-up in exchange-based trading because the central clearing features of exchange platforms significantly reduce counterparty risk. The sole purpose of name give-up is to enable the Dealer Defendants to ensure that no buy-side investor is trading IR swaps on the inter-dealer platforms.

13.     Defendants' collusion has injured, and continues to injure, buy-side investors by causing them to transact IR swaps at artificially wider bid-ask spreads and depriving them of the benefits of a competitive marketplace. As a result, Plaintiff, on behalf of itself and others

---

[1] Charles Levinson, *Startup Challenges Dominance of Big Banks in Derivatives Markets*, REUTERS, Mar. 10, 2015, http://www.reuters.com/article/2015/03/10/markets-derivatives-exchange-insight-gra-idUSL1N0WB2D520150310.

similarly situated, seeks injunctive relief to stop Defendants' collusive practices, as well as damages, trebled, and restitution of Defendants' ill-gotten gains.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and (26)) and pursuant to 28 U.S.C. §§ 1331 and 1337(a).

15.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

16.     This Court has personal jurisdiction over each Defendant because each Defendant: transacted business throughout the United States, including this District; had substantial contacts with the United States, including in this District; and/or committed overt acts in furtherance of their illegal scheme and conspiracy in the United States. In addition, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

17.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on foreign and interstate commerce of the United States.

## THE PARTIES

### A.     Plaintiff

18.     Plaintiff Genesee County Employees' Retirement System is a multiple-employer defined benefit pension plan with its principal place of business in Flint, Michigan. Participating

employer units include Genesee County, Genesee County Road Commission, Genesee County Community Mental Health, Genesee County Division of Water and Waste Services, Genesee District Library, and the City of Mt. Morris. During the Class Period, Plaintiff transacted in IR swaps. As a result of Defendants' unlawful conduct, Plaintiff was injured in its business or property.

### B.  Defendants

19.     Whenever reference is made to any act, deed, or transaction of any corporation or partnership, the allegation means that the corporation or partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parent, predecessors, or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs or affairs of the corporation or partnership.

### 1.  Dealer Defendants

#### (a)  Bank of America

20.     Defendant Bank of America Corporation is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina.

21.     Defendant Bank of America, N.A. is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina and branch locations in New York, New York. Bank of America, N.A. is a wholly-owned subsidiary of Bank of America Corporation. On January 1, 2009, Bank of America acquired Merrill Lynch & Co., Inc.

22.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York. Merrill Lynch, Pierce, Fenner & Smith Incorporated is a wholly-owned subsidiary of Bank of America Corporation. In addition, Merrill Lynch, Pierce,

Fenner & Smith Incorporated is registered as a broker-dealer with the U.S. Securities and

Exchange Commission ("SEC"), and as a Futures Commission Merchant ("FCM") with the U.S.

Commodity Futures Commission ("CFTC").

23.    Defendants Bank of America Corporation, Bank of America, N.A., and Merrill

Lynch, Pierce, Fenner & Smith Incorporated are collectively referred to as "**Bank of America.**"

During the Class Period, Bank of America directly sold IR swaps to and bought IR swaps from

class members. In addition, during the Class Period, Bank of America was a shareholder of

Tradeweb.

**(b)    Barclays**

24.    Defendant Barclays PLC is a corporation organized and existing under the laws of

England and Wales, with its principal place of business in London, England.

25.    Defendant Barclays Bank PLC is a corporation organized and existing under the

laws of England and Wales, with its principal place of business in London, England and a branch

location in New York, New York.

26.    Defendant Barclays Capital Inc. is a corporation organized and existing under the

laws of the State of Connecticut, with its principal place of business in New York, New York,

and is a wholly-owned subsidiary of Barclays Group US Inc., which in turn is a wholly-owned

subsidiary of Barclays Bank PLC. In addition, Barclays Capital Inc. is registered as a broker-

dealer with the SEC, and as an FCM with the CFTC.

27.    Defendants Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc. are

collectively referred to as "**Barclays**." During the Class Period, Barclays directly sold IR swaps

to and bought IR swaps from class members. In addition, during the Class Period, Barclays was a

shareholder of Tradeweb.

### (c)  BNP Paribas

28.     Defendant BNP Paribas, S.A. is a corporation organized and existing under the laws of the France, with its principal place of business in Paris, France and branch locations in the United States, including its New York, New York branch.

29.     Defendant BNP Paribas Securities Corp. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly-owned subsidiary of BNP Paribas North America, Inc., the ultimate parent of which is BNP Paribas, S.A. In addition, BNP Paribas Securities Corp. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

30.     Defendants BNP Paribas, S.A. and BNP Paribas Securities Corp., are collectively referred to as "**BNP Paribas**". During the Class Period, BNP Paribas directly sold IR swaps to and bought IR swaps from class members. BNP Paribas also agreed with other Defendants to boycott the SEFs, which are located in New York.

### (d)  Citi

31.     Defendant Citigroup, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

32.     Defendant Citibank N.A. is a federally chartered national banking association with its principal place of business in New York, New York, and is a wholly-owned subsidiary of Citigroup, Inc.

33.     Defendant Citigroup Global Markets Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York, and is a wholly-owned subsidiary of Citigroup Financial Products Inc., whose ultimate parent is Citigroup, Inc. In addition, Citigroup Global Markets Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

34.     Defendant Citigroup Global Markets Limited is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England.

35.     Defendants Citigroup, Inc., Citibank N.A., Citigroup Global Markets Inc., and Citigroup Global Markets Limited are collectively referred to as "**Citi**." During the Class Period, Citi, itself and through its affiliate agents, directly sold IR swaps to and bought IR swaps from class members. In addition, during the Class Period, Citi was a shareholder of Tradeweb.

(e)     **Credit Suisse**

36.     Defendant Credit Suisse Group AG is a corporation organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland.

37.     Defendant Credit Suisse AG is a bank organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland, and it maintains a New York, New York branch.

38.     Defendant Credit Suisse International is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England.

39.     Defendant Credit Suisse Securities (USA) LLC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York, and is a wholly-owned subsidiary of Credit Suisse (USA), Inc., whose ultimate parent is Credit Suisse Group AG. In addition, Credit Suisse Securities (USA) LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

40.     Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, and Credit Suisse Securities (USA) LLC are collectively referred to as "**Credit Suisse**." During the Class Period, Credit Suisse, itself and through its affiliate agents, directly

sold IR swaps to and bought IR swaps from class members. In addition, during the Class Period, Credit Suisse was a shareholder of Tradeweb.

### (f)   Deutsche Bank

41.     Defendant Deutsche Bank AG is a corporation organized and existing under the laws of Germany with its principal place of business in Frankfurt, Germany. In addition, during the Class Period, Deutsche Bank AG was a shareholder of Tradeweb.

42.     Defendant Deutsche Bank Securities Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly-owned subsidiary of DB U.S. Financial Markets Holding Corporation, whose ultimate parent is Deutsche Bank AG. In addition, Deutsche Bank Securities Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

43.     Defendants Deutsche Bank AG and Deutsche Bank Securities Inc. are collectively referred to as "**Deutsche Bank**." During the Class Period, Deutsche Bank directly sold IR swaps to and bought IR swaps from class members.

### (g)   Goldman Sachs

44.     Defendant The Goldman Sachs Group, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

45.     Defendant Goldman Sachs & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. In addition, Goldman Sachs & Co. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

46.     Defendant Goldman Sachs Bank USA is a New York state-chartered bank and a member of the Federal Reserve's system, with its principal place of business in New York, New York, and is a wholly-owned subsidiary of The Goldman Sachs Group.

47.     Defendant Goldman Sachs Financial Markets, L.P. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly-owned subsidiary of Goldman Sachs Group.

48.     Defendant Goldman Sachs International is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England, and is a wholly-owned subsidiary of The Goldman Sachs Group.

49.     Defendants The Goldman Sachs Group, Goldman Sachs & Co., Goldman Sachs Bank USA, Goldman Sachs Financial Markets, L.P., and Goldman Sachs International are collectively referred to "**Goldman Sachs**." During the Class Period, Goldman Sachs directly sold IR swaps to and bought IR swaps from class members. During the Class Period, Goldman Sachs was a shareholder of Tradeweb.

### (h)     HSBC

50.     Defendant HSBC Bank PLC is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England.

51.     Defendant HSBC Bank USA, N.A. is a federally chartered national banking association with its principal place of business in McLean, Virginia and branch locations in New York, New York.

52.     Defendant HSBC Securities (USA) Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. In addition, Defendant HSBC Securities (USA) Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

53.     Defendants HSBC Bank PLC, HSBC Bank USA, N.A., and HSBC Securities (USA) Inc. are collectively referred to as "**HSBC**." During the Class Period, HSBC directly sold IR swaps to and bought IR swaps from class members. HSBC also agreed with other Defendants to boycott the SEFs, which are located in New York.

### (i)     JPMorgan

54.     Defendant J.P. Morgan Chase & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

55.     Defendant J.P. Morgan Chase Bank, N.A. is a federally chartered national banking association with its principal place of business in New York, New York.

56.     Defendant J.P. Morgan Securities LLC (also known as J.P. Morgan Securities Inc.) is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York, and is a wholly-owned subsidiary of J.P. Morgan Securities Holdings LLC, which in turn is a subsidiary of JPMorgan Chase & Co. In addition, J.P. Morgan Securities LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

57.     Defendant J.P. Morgan Securities Plc is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England, and is a wholly-owned subsidiary of J.P. Morgan Chase & Co.

58.     Defendants J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., J.P. Morgan Securities LLC, and J.P. Morgan Securities Plc are collectively referred to as "**JPMorgan**." During the Class Period, JPMorgan directly sold IR swaps to and bought IR swaps from class members. During the Class Period, JP Morgan was a shareholder of Tradeweb.

### (j)     Morgan Stanley

59.     Defendant Morgan Stanley is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

60.     Defendant Morgan Stanley Bank, N.A. is a federally chartered national banking association with its principal place of business in Salt Lake City, Utah, and is a wholly-owned subsidiary of Morgan Stanley Delta Holdings LLC, the ultimate parent of which is MS.

61.     Defendant Morgan Stanley & Co. LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly-owned subsidiary of Morgan Stanley Domestic Holdings, Inc., the ultimate parent of which is Morgan Stanley. In addition, Morgan Stanley & Co. LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

62.     Defendant Morgan Stanley Capital Services LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly-owned subsidiary of Morgan Stanley Domestic Holdings, Inc., the ultimate parent of which is Morgan Stanley.

63.     Defendant Morgan Stanley Derivative Products Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly-owned subsidiary of Morgan Stanley.

64.     Defendant Morgan Stanley & Co. International plc is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England, and is a subsidiary of Morgan Stanley UK Group, the ultimate parent of which is Morgan Stanley.

65.     Defendant Morgan Stanley Bank International Limited is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England, and is a wholly-owned subsidiary of Morgan Stanley International Holdings Inc., the ultimate parent of which is Morgan Stanley.

66.     Defendants Morgan Stanley; Morgan Stanley Bank, N.A.; Morgan Stanley & Co. LLC; Morgan Stanley Capital Services LLC; Morgan Stanley Derivative Products Inc.; Morgan Stanley & Co. International plc; and Morgan Stanley Bank International Limited are collectively referred to as "**Morgan Stanley**." During the Class Period, Morgan Stanley directly sold IR swaps to and bought IR swaps from class members. During the Class Period, Morgan Stanley was a shareholder of Tradeweb.

**(k)     RBS**

67.     Defendant Royal Bank of Scotland PLC is the primary operating bank of Defendant The Royal Bank of Scotland Group PLC, a corporation organized and existing under the laws of England and Wales with its principal place of business in Edinburgh, Scotland and regional offices in New York, New York and Stamford, Connecticut.

68.     Defendant RBS Securities Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business in Stamford, Connecticut, and is a wholly-owned subsidiary of Royal Bank of Scotland PLC. In addition, RBS Securities Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

69.     Defendants Royal Bank of Scotland PLC, Royal Bank of Scotland Group PLC, and RBS Securities Inc. are collectively referred to as "**RBS**." During the Class Period, RBS directly sold IR swaps to and bought IR swaps from class members. In addition, during the Class Period, RBS was a shareholder of Tradeweb.

**(l)     UBS**

70.     Defendant UBS AG is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland and regional offices in New York, New York and Stamford, Connecticut.

71.     Defendant UBS Securities LLC is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York, and is an indirect wholly-owned subsidiary of UBS AG. In addition, UBS Securities LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

72.     Defendants UBS AG and UBS Securities LLC are collectively referred to as "**UBS**." During the Class Period, UBS directly sold IR swaps to and bought IR swaps from class members. In addition, during the Class Period, UBS was a shareholder of Tradeweb.

### 2.     Non-Bank Defendants

73.     Defendant ICAP Capital Markets LLC ("**ICAP**") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Jersey City, New Jersey. In the IR swaps market, ICAP acts as an interdealer broker, brokering IR swaps trades between dealers.

74.     Defendant Tradeweb Markets LLC ("**Tradeweb**") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Tradeweb's historical focus has been on providing electronic trading services in the D2C segment of the IR swaps market. Tradeweb is jointly owned by Thomson Reuters, and Dealer Defendants Bank of America, Barclays, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, RBS, and UBS.[2] The Dealer Defendants exercise control over Tradeweb.

---

[2] *See* Matthew Leising, *Tradeweb's Bank Owners Said to Consider New Bond-Trading System*, BLOOMBERG, Nov. 23, 2013, http://www.bloomberg.com/news/articles/2013-11-22/ tradeweb-s-bank-owners-said-to-consider-new-bond-trading-system.

## BACKGROUND

I.    **IR Swaps**

75.    An IR swap is an agreement between two parties to trade interest-rate cash flows on a specific amount of money for a fixed period of time. In most IR swaps, one party pays a fixed rate of interest and the other party pays a floating rate of interest, usually the London Interbank Offering Rate ("LIBOR"), a benchmark set by the British Bankers Association that is used to assess interbank borrowing costs. The fixed rate payer can also be called the floating rate receiver and is often referred to as having bought the swap or having a "long" position. Conversely, the floating rate payer can also be called the fixed rate receiver and is referred to as having sold the swap and having a "short" position.

76.    The following schematic illustrates a typical interest rate swap transaction where the Receiver pays the floating rate (here, LIBOR) to the Payer, and the Payer pays a fixed rate to the Receiver:



77.    A fixed-for-floating rate swap allows parties with floating rate debt to hedge their interest rate exposure on that debt by receiving a variable rate in exchange for paying a fixed rate.

II.    **IR Swaps Historically**

78.    IR swaps have become an integral part of governmental and corporate finance. The first IR swap was a 1982 agreement in which Sallie Mae swapped the interest payments on an issue of intermediate term, fixed-rate debt for floating rate interest payments indexed to the

three month U.S. Treasury bill. While the first IR swaps agreements were heavily negotiated and individualized, the industry quickly developed standard terms to facilitate ease of transacting in these instruments. Industry adoption of the ISDA Master Agreement drove the standardization of IR swaps. By 2000, all of the material terms of most IR swaps—*e.g.*, the tenor, the fixed rate, the benchmark rates used to calculate floating payments, and the timing of payments—were standardized, resulting in lower transaction costs and higher trading volumes.

79.     Since then, the market for interest rate swaps has grown exponentially. According to the Bank of International Settlements, as of June 2015, the global interest rate swaps market had a notional size of $320 trillion.

## III.     IR Swaps Trading

80.     IR swaps trading typically works as follows. A buy-side customer asks a dealer for a quote either: (1) to pay the floating rate and receive a fixed rate; or (2) to pay the fixed rate and receive a floating rate. The rate at which the dealer will pay the fixed rate is known as the "bid," and the rate at which it will receive the fixed rate is known as the "ask." The floating rate in either case is typically based on LIBOR or another benchmark rate. The fixed rate is the primary term that is subject to negotiation when entering into an IR swap trade. A buy-side investor that is seeking to pay the floating and receive the fixed rate will receive the bid price quoted by a dealer for the fixed rate. A buy-side investor seeking to pay the fixed rate and receive the floating rate will pay the ask price quoted by a dealer for the fixed rate.

81.     The Dealer Defendants profit by paying low on fixed rates (*i.e.*, the bid price) and receiving higher fixed rates (*i.e.*, the ask price). This difference is known as the "bid/ask spread" or the "spread." The wider the spread, the more money the Dealer Defendants make. The mid-point of the spread is generally known as the mid-market price.

82.     Historically, trading between the Dealer Defendants and their customers—*i.e.*, the D2C segment—occurs OTC. In the OTC environment, price discovery is limited because a buy-side investor can realistically only call a limited number of dealers to shop for the best pricing. Further, because prices move continuously, the delay caused by calling multiple dealers for quotes will not ensure that any one dealer's quote will remain the best at the time of execution. As a result, buy-side customers are unable to shop around, compare all dealers' quotes, and force dealers to compete directly on price.

83.     Even with the emergence of some electronic forms of trading, dealers typically convey their quotes on a "take-it-or-leave-it" basis. Similarly, while over the last few years some companies have launched trading platforms for trading with buy-side investors, these trading platforms use a request-for-quotation ("RFQ") protocol whereby buy-side investors can request quotes from several dealers at once. However, these quotes are not executable. As a result, buy-side customers must contract with a dealer for the true price.

84.     By contrast, the Dealer Defendants in the D2D segment trade with each other in a more competitive and transparent manner. Inter-dealer brokers ("IDBs") have created electronic exchange platforms that allow dealers to submit their bid and ask prices to an IDB, which then publicizes the best quotes, making them viewable to and executable by other dealers. A dealer can view multiple simultaneous quotes via an IDB platform, thereby giving it access to the best bids and asks in the market. IDBs use CLOBs, which automatically match the best bids and offers on an anonymous basis.[3] The dealer can immediately enter into an IR swaps contract at a quoted price without negotiation, or it can ask the IDB to offer a better price. In return for facilitating dealer-to-dealer trades, IDBs earn commissions on each executed trade. According to

---

[3] Luke Jeffs, *GFI Boss Defends Hedge Funds Access to Platforms*, FINANCIAL NEWS, Oct. 1, 2007.

Mickey Gooch, the founder and Chief Executive of GFI, "[f]or the most liquid, electronic markets, there is little difference between the exchanges and the IDBs."[4]

85.     On IDB platforms, the dealers' identities are concealed from one another until they agree to enter into a trade. Because IDB platforms allow dealers to view and choose from numerous bid and offer prices, dealers trade with each other at or close to mid-market prices.

86.     This competitive price transparency in the D2D market segment further benefits the Dealer Defendants because, at the same time they provide bids and asks in the D2C segment, they simultaneously see the true mid-market prices available in the D2D segment. This informational advantage allows dealers to charge a bid-ask spread premium in the D2C market that they would not receive among their own peers in the D2D market.

87.     While only dealers have access to CLOB trading, there is nothing in the intrinsic properties of IR swaps trading that requires that to be the case. IR swaps are ripe for trading on exchange-like CLOB platforms because they are standardized, liquid, and capable of being cleared.[5] "A centralised trading platform can bring together a large set of traders with opposing trading interests, reducing search frictions and raising competition to fill an order."[6]

88.     The introduction of all-to-all CLOB trading brings pricing transparency to the marketplace, thereby narrowing bid-ask spreads. Market participants agree. The Managed Funds Association has expressed the view that "SEFs will benefit investors and the markets by increasing regulatory and market efficiencies, promoting market-based competition among

---

[4] *Id.*

[5] *See* Darrell Duffie, DARK MARKETS 6-7 (2012).

[6] *See* BANK FOR INT'L SETTLEMENTS, ELECTRONIC TRADING IN FIXED INCOME MARKETS 20 (2016) at 23, http://www.bis.org/publ/mktc07.pdf (internal citations omitted).

providers and enabling greater transparency over time and across a variety of products."[7] Adam

C. Cooper, Senior Managing Director and Chief Legal Officer of Citadel, similarly stated that

"[i]ncreased competition, the entry of alternative liquidity providers, the development of an all-

to-all market, and the emergence of electronic and/or anonymous execution will combine to

narrow bid-ask spreads in the swaps market."[8]

89.     The only reason why there is a persistent difference in pricing levels and

transparency between the D2D and D2C is that Defendants have conspired to keep it that way.

Defendants' concerted efforts to maintain the bifurcation of the IR swaps market has allowed,

and continues to allow, the Dealer Defendants to maintain supracompetitive bid-ask spreads.

## DEFENDANTS' ANTICOMPETITIVE CONDUCT

### I.    The Dealer Defendants Took Control of Tradeweb to Prevent the Development of a Competitive Exchange Trading Platform

90.     By 2008, the IR swaps market was primed and ready for the introduction of all-to-

all electronic trading. By early 2008, Tradeweb was poised to introduce exchange trading to the

IR swaps market—a development that should have been embraced by the marketplace. Instead,

the Dealer Defendants acted in concert to neutralize the threat that Tradeweb posed.

91.     Tradeweb was initially founded as a private dealer-backed firm owned by a

consortium of banks—including Dealer Defendants Credit Suisse, Citi, Goldman Sachs, Bank of

America (through its predecessor Merrill Lynch), Morgan Stanley, JPMorgan, and Deutsche

Bank—that focused on creating an online marketplace for fixed-income products, such as U.S.

---

[7] Managed Funds Association's View on Swap Execution Facilities, https://www.managedfunds.org/issues-policy/u-s-legislative-priorities/otc-derivatives-2/.

[8] Adam C. Cooper, Senior Managing Director and Chief Legal Officer, Citadel, Comment Letter to the Commodity Futures Trading Commission regarding Notice of Proposed Rulemaking on Customer Clearing Documentation and Timing of Acceptance for Clearing and Notice of Proposed Rulemaking on Clearing Member Risk Management (Sept. 30, 2011).

Treasuries. In 2004, Tradeweb was acquired by Thomson Reuters, but, as part of the deal, the founding banks continued to provide liquidity to Tradeweb's platform.

92.     Tradeweb touted itself as a "real-time trading platform" and boasted it was "well positioned to capture new business as the market migrates to more efficient electronic trading platforms."[9] The Dealer Defendants thus became concerned that, under Thomson Reuters' control, Tradeweb would transform into an all-to-all platform that would deprive them of the informational advantages that they had over buy-side investors.

93.     But the Dealer Defendants knew Tradeweb's Achilles' heel: Tradeweb needed the Dealer Defendants' continued liquidity support to sustain its profitability, but, by 2007, Tradeweb's liquidity contracts with the Dealer Defendants were expiring. Thomson Reuters feared that Tradeweb's value would be significantly diminished if the Dealer Defendants steered liquidity to alternate trading platforms, starving it of trading volume and revenue. According to one source, "Thomson realized the banks would take their liquidity and shop it around, which would threaten the value of Tradeweb."[10]

94.     The Dealer Defendants capitalized on Tradeweb's vulnerability and wrested control of the company, weakening the influence of Thomson Reuters. In or around October 2007, certain Dealer Defendants—Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, RBS, and UBS—invested approximately $180 million and took equity stakes in Tradeweb.[11] As part of the deal, these Dealer Defendants also "agreed to [continue] provid[ing]

---

[9] *Thomson to Acquire TradeWeb*, TRADEWEB, Apr. 8, 2004, http://www.tradeweb.com/News/News-Releases/Thomson-to-Acquire-TradeWeb/.

[10] Ivy Schmerken, *Thomson Plans to Spin Off Tradeweb*, WALL ST. & TECH., Oct. 10, 2007, http://www.wallstreetandtech.com/trading-technology/breaking-news-thomson-plans-to-spin-off-tradeweb/d/d-id/1258992.

[11] *Id.*

liquidity into Tradeweb's markets, including interest-rate swaps," rather than "shop it around."[12] Later, Bank of America, Citigroup, and Barclays also became investors in Tradeweb.[13] As a result of their ownership interests, the Dealer Defendants obtained the right to determine how Tradeweb was governed. This allowed the Dealer Defendants to ensure that Tradeweb would not convert its platform to one with protocols that would provide more competition and transparency to the buy-side.

95.     The Dealer Defendants that invested in Tradeweb also agreed with each other that they would not support other trading platforms that threatened their investment in Tradeweb or that threatened to move the market toward all-to-all exchange trading.

96.     These Dealer Defendants filled Tradeweb's Board of Directors and governance committees with their own senior personnel so that they could control Tradeweb and use it to collude in secret. The Dealer Defendants used Tradeweb to meet in private and to secretly conspire to control the IR swaps market. Representatives of the Dealer Defendants met regularly under the cover of Tradeweb's Board and informally, outside of formal Board duties, to coordinate their joint efforts to prevent the buy-side from being able to trade IR swaps in an all-to-all, CLOB model.

97.     The Dealer Defendants also exercised control of Tradeweb via its governance committees. Some examples of Tradeweb's governance committees are the "participation committees" that determine who can participate on Tradeweb's SEFs.[14] Acting through these

---

[12] *Id.*

[13] *See* Leising, *supra* note 2.

[14] *See DW SEF LLC: SEF Participation Committee Charter*, TRADEWEB, http://www.tradeweb.com/uploadedFiles/Tradeweb/Content/About_Us/Regulation/DW%20SEF%20Participation%20Committee%20Charter.pdf; *TW SEF LLC: SEF Participation Committee Charter*, TRADEWEB,

*(continued . . . )*

committees, the Dealer Defendants met and agreed on how to coordinate their conduct to ensure that no threat to their collective dominance of the OTC market would succeed. To facilitate the conspiracy, Tradeweb kept and continues to keep these committees and the identities of their members hidden from the public.

98.     Tradeweb holds itself out as an independent company, pursuing its own objectives in the market. The Dealer Defendants, however, pressured Tradeweb to agree to take actions against its own individual interest. For instance, the independent (*i.e.*, non-bank) managers of Tradeweb recognized it would be in Tradeweb's interest to launch an all-to-all anonymous electronic trading platform and took steps to implement such a platform. But upon learning of these attempts by Tradeweb's personnel, the Dealer Defendants quickly pressured them to change course. In turn, the Tradeweb managers agreed with the Dealer Defendants that Tradeweb would not implement procompetitive changes to its trading platform.

99.     Tradeweb publicly touts itself as a modern, efficient trading platform that can provide "accurate pricing information" and "greater market transparency."[15] But these "benefits" are a sham and were introduced only to placate the buy-side's increasing demands for all-to-all trading. Pursuant to its agreement with the Dealer Defendants, Tradeweb merely facilitates D2C trades on an RFQ platform, rather than through CLOB, and does not allow buy-side clients to trade directly with one another.

100.     As a result, the Dealer Defendants used Tradeweb to extract the same supracompetitive profits on D2C transactions that they had historically realized in the OTC

---

( . . . continued)
http://www.tradeweb.com/uploadedFiles/Tradeweb/Content/About_Us/Regulation/TW%20SEF%20Parti
cipation%20Committee%20Charter.pdf.

[15] *Nine Global Dealers and Thomson Financial Form Premier Electronic Trading Venture Using TradeWeb*, TRADEWEB, Oct. 11, 2007, http://www.tradeweb.com/News/News-Releases/Nine-Global-Dealers-and-Thomson-Financial-Form-Premier-Electronic-Trading-Venture-Using-TradeWeb/.

market. Absent a conspiracy, this would be against Tradeweb's independent interest. Making an efficient, highly demanded trading platform available to all market participants would increase the number of trades on Tradeweb and thus increase the fees that it obtained. Tradeweb's conduct only makes sense as an instrument of the conspiracy.

101.    Tradeweb continues to play an active role in maintaining a two-tiered market structure. Tradeweb currently operates two different SEFs: Dealerweb, which is "designed exclusively for dealers" and allows anonymous trading, and Tradeweb SEF, which "is designed for non-dealer market participants and always discloses counterparty identities."[16] Tradeweb charges approximately $50,000 per month to trade on Dealerweb but only approximately $100 per month to trade on Tradeweb. It is "challenging to find a legitimate rationale for this enormous cost differential between these two platforms operated by the same company."[17] That is because the real reason for this cost structure—which was set up jointly by the Dealer Defendants—is that it "effectively establishes and entrenches a bifurcated dealer-to-dealer and dealer-to-customer marketplace" in furtherance of Defendants' conspiracy.[18]

## II.    The Dealer Defendants Utilize Other Fora to Collude

102.    In addition to using Tradeweb, the Dealer Defendants coordinate their conspiracy through other fora as well.

103.    One of these is the International Swaps and Derivatives Association ("ISDA"). ISDA is nominally an industry trade group, but, in reality, during the Class Period, it served the interests of the Dealer Defendants.

---

[16] Dennis Kelleher, Caitlin Kline, & Victoria Daka, *Stopping Wall Street's Derivatives Dealers Club*, BETTER MARKETS, Feb. 2016, at 12, https://www.bettermarkets.com/sites/default/files/Better%20Markets%20Policy%20Brief%20-%20Stopping%20Wall%20Street%E2%80%99s%20Derivatives%20Dealers%20Club.pdf.

[17] *Id.*

[18] *Id.* at 12-13.

104.    From 2008 to the present, the Dealer Defendants controlled ISDA's Board of Directors and used those roles to discuss the IR swaps market and their conspiracy. The following employees of the Dealer Defendants hold positions on the ISDA Board of Directors, and use ISDA to ensure that they all remain on the same page regarding their collective boycott of all-to-all electronic platforms for IR swaps trading: Stephen O'Connor (Morgan Stanley: Chairman), Ciaran O'Flynn (Morgan Stanley: Director), Keith Bailey (Barclays: Secretary), Diane Genova (JPMorgan: Treasurer), Biswarup Chatterjee (Citigroup: Director), Kieran Higgins (RBS: Director), Thibaut de Roux (HSBC: Director), Elie El Hayek (HSBC: Director); Christopher Murphy (UBS: Director), Will Roberts (Bank of America: Director), and Eraj Shirvani (Credit Suisse: Director).

105.    In addition, the Dealer Defendants meet and collude under the auspices of meetings of the Board of Directors of the Futures Industry Association ("FIA"), or as part of various FIA "working groups." The following employees of the Dealer Defendants currently hold positions on the Board of Directors of FIA America (FIA's American division): Malcolm Clark Hutchison (Deutsche Bank), Michelle Neal (Deutsche Bank), Emily Portney (JPMorgan), Michael Dawley (Goldman Sachs, and current Chairman of FIA), Craig Abruzzo (Morgan Stanley), Jeffery Jennings (Credit Suisse), Jerome Kemp (Citi), Najib Lamhaouar (HSBC), and Edward Pia (UBS).

106.    ISDA and FIA often coordinated to create "working groups" that provide a forum for collusion. One such working group was devoted to the drafting of the "Cleared Derivatives Execution Agreement" ("CDEA")—a standard form contract intended to govern the relationship between FCMs and their customers.

### III.   The Dealer Defendants Prevented Interdealer Brokers from Opening Exchange-Like Platforms to Buy-Side Investors

107.    In addition to taking control of Tradeweb and preventing it from offering more competitive trading, the Dealer Defendants conspired to prevent other market actors from opening exchange-like platforms. In particular, the Dealer Defendants identified IDBs as a potential platform for facilitating buy-side exchange trading and moved decisively to thwart that threat.

108.    By 2008, IDBs were well positioned to bring to market all-to-all IR swaps trading platforms that included the buy-side. Many Defendant Dealers already operated such platforms in the D2D segment and opening access to buy-side investors would not have posed any additional technological burden. Since IDBs earned brokerage fees on each trade on their platforms, they had no reason to exclude buy-side investors from executing IR swaps on IDB platforms.

109.    However, the Dealer Defendants agreed with ICAP and other IDBs that the dealers would direct D2D IR swaps transactions onto IDB platforms. In exchange for this dependable revenue stream, the IDBs would not allow buy-side firms to trade on their platforms. The Dealer Defendants also threatened the IDBs with collective boycotts if they allowed buy-side access to their platforms.[19] Indeed, when "a swaps exchange run by GFI Group said it would allow anonymous trading, several banks threatened to pull their business off the platform."[20]

110.    The Dealer Defendants' interactions with ICAP are paradigmatic of their efforts to work with IDBs in order to avoid competition. ICAP and Tradeweb (which the Dealer

---

[19] *See, e.g.*, Levinson, *supra* note 1.

[20] *Id.*

Defendants owned and controlled) were two of the largest competitors in the D2D segment for IR swaps trading services.

111.    In 2009, competition between the two came to a head. In April 2009, Tradeweb decided to enter the mortgage bond market, offering a trading platform through a division known as Dealerweb.[21] The result was that ICAP "lost 85 percent of its business over six weeks" in the mortgage bond market after Dealerweb "basically walked away with the market."[22]

112.    At or around the same time, ICAP was developing an all-to-all, anonymous electronic-trading platform for the European IDB IR swaps market called i-Swap. The Dealer Defendants knew that ICAP could easily open i-Swap to investors in the United States.[23] The launch of i-Swap threatened to collapse the bifurcated IR swaps market the Dealer Defendants sought to maintain.

113.    Rather than continuing to compete aggressively, Tradeweb, the Dealer Defendants, and ICAP brokered a truce: to avoid damaging each other's business, the Dealer Defendants (through Tradeweb) agreed that they would not further expand (through Dealerweb) into the IDB space, while, in exchange, ICAP agreed not to expand into the D2C space by establishing an all-to-all anonymous IR swaps trading platform. In essence, both forewent lucrative opportunities to expand and compete in exchange for preserving their dominance in their respective markets.

114.    Following its earlier agreement with the Dealer Defendants and Tradeweb, when ICAP expanded i-Swap to the United States in February 2013 it limited participation to the

---

[21] *See* Bryce Elder & Neil Hume, *Icap Hurt by Banks' Platform*, FINANCIAL TIMES, Apr. 21, 2009, http://www.ft.com/intl/cms/s/0/a4bf29a2-2ead-11de-b7d3-00144feabdc0.html#axzz419KBvtLz.

[22] *Id.*

[23] *See* Michael McKenzie, *Rate Swap Traders Wait For No Man*, FINANCIAL TIMES, Oct. 19, 2010, http://www.ft.com/cms/s/0/9c6cf29c-dba5-11df-a1df-00144feabdc0.html #axzz3p2lJ0933.

dealers.[24] The Dealer Defendants supported i-Swap by directing order flow to it. In doing so, the Dealer Defendants reinforced ICAP's status as the lead IR swaps IDB and ensured that it saw no need to open up the platform to the buy-side. Absent Defendants' conspiracy, ICAP would have launched i-Swap as an all-to-all anonymous trading platform where the buy-side could trade directly with each other without going through a dealer.

115.    The Dealer Defendants continue to direct liquidity only to those SEF operators, like Defendants ICAP and Tradeweb, that agree to limit access to exchange-like trading to the buy-side. Trading platforms that comply with the rules of the conspiracy receive the vast majority of the trading volume of the Dealer Defendants, resulting in high revenues.

## IV.   The Dealer Defendants Collectively Boycotted SEFs and Exchange-Like Trading Platforms from Entering the Market

116.    In addition to coercing IDBs into limiting buy-side investor access to their platforms, the Dealer Defendants also collectively boycotted existing exchange-like trading platforms and prevented the emergence of new trading platforms that would have brought such trading possibilities to the buy-side.

117.    In 2010, Congress passed the Dodd-Frank Act in an effort to bring increased transparency and competition to swaps and other derivatives markets. Among other things, Dodd-Frank mandated that certain derivatives, including IR swaps, be traded on exchanges or SEFs. Congress envisioned that exchanges or SEFs would include trading platforms on which the buy-side could trade electronically with other buy-side members or dealers—thereby reaping the benefits of exchange trading in the form of price transparency and competitive pricing.

---

[24] *See* ICAP, *ICAP Launches i-Swap in the US* (Feb. 19, 2013), http://www.icap.com/ what-we-do/electronic/i-swap.aspx.

118.    Faced with the threat that electronic trading platforms or SEFs would upset the market order in which they sat at the top, the Dealer Defendants worked together to prevent exchange-like trading platforms from introducing greater competition and transparency to the buy-side. Among other things, the Dealer Defendants conspired to ensure that no SEF would succeed if it tried to offer anonymous all-to-all trading platforms.

119.    The Dealer Defendants boycotted market entrants that dared to open up exchange-like trading of IR swaps to the buy-side. These efforts have "been relentless—sometimes buried in SEF rulebooks and trading workflow minutia, and other times amounting to outright intimidation."[25] As a result of these collective steps, Defendants have successfully prevented meaningful change in the market.[26] According to one report: "Two weeks after the regulatory shift related to the Dodd-Frank Act took effect, there's been little change—and little indication that it's coming. Banks are trading interest-rate swaps exclusively with banks in one area, while buyers and sellers such as money managers are doing business in another."[27]

120.    At least three different SEFs—Javelin, TeraExchange, and TrueEx—developed the necessary technology, secured the required regulatory approvals, and were able to garner sufficient buy-side support to bring exchange-like trading platforms to the buy-side. These platforms would have introduced anonymous all-to-all trading of IR swaps for the buy-side, bringing more competition and transparency to the market.

121.    The Dealer Defendants prevented each of these SEFs from become viable competitors by refusing to trade and clear for them. That is, the Dealer Defendants conspired to boycott these entities.

---

[25] Kelleher, *et al.*, *supra* note 16, at 12.

[26] *See* Leising, *supra* note 2.

[27] *Id.*

122.    When Javelin, TeraExchange, and TrueEx solicited the participation of the Dealer Defendants, the Dealer Defendants agreed with each other to ensure collective action with respect to the platform.

123.    The Dealer Defendants shared with each other their joint intentions to keep these insurgent platforms from entering the market and threatening their positions as the incumbent market makers. They used a variety of tools to ensure that these platforms failed so they could keep the buy-side relegated to trading on platforms that are nothing more than the functional equivalent of the OTC marketplace.

124.    The result is that Javelin, TeraExchange, and TrueEx have done little or no IR swaps trading and the buy-side continues to be shut out of exchange-like trading. The following charts show SEF market shares for U.S. dollar denominated IR swaps in between January 2014 and December 2014. As can be seen below, Javelin and TrueEx have almost zero market share, and TeraExchange's business, which had all but shuttered at that point, does not even register.[28]

---

[28] Amir Khwaja, *A Review of 2014 US Swap Volumes*, CLARUS FINANCIAL TECHNOLOGY, https://www.clarusft.com/a-review-of-2014-us-swap-volumes/.



### A.    The Dealer Defendants Boycotted Javelin

125.    In 2011, Javelin began developing an anonymous all-to-all IR swaps exchange-like trading platform. Javelin's proposed platform would have been a major step forward for the buy-side, granting them access to an exchange-trading platform similar to those used by the Dealer Defendants.

126.    In 2013, Javelin began soliciting support for its platform by demonstrating its utility to many buy-side entities and dealers, including certain Dealer Defendants.

127.    However, most of the Dealer Defendants refused to agree to support Javelin. This is because, as alleged above, they had agreed with each other only to support platforms they could control.

128.    As a result of the Dealer Defendants' boycott, Javelin today effectively has no revenues and facilitates no IR swaps trading. Despite years of development and millions of dollars in investment capital, less than 200 trades have been executed on Javelin since its launch. The chart below demonstrates Javelin's lack of competitiveness in the D2C segment.



129.    Absent the Dealer Defendants' anticompetitive boycott, buy-side firms would have traded between and amongst themselves on Javelin's platform, leading to greater competition in the IR swaps market and tighter bid/ask spreads, which would have benefited Plaintiff and the Class.

**B.      The Dealer Defendants Boycotted TeraExchange**

130.    TeraExchange was formed in 2010. After raising $7 million in capital on a $27 million valuation, it developed an anonymous order book for several asset classes, including IR

swaps.[29] TeraExchange went to great lengths to create a viable CLOB trading platform. It connected to the clearinghouse of the Chicago Mercantile Exchange ("CME") and worked to develop a portfolio margining system so that participants could easily calculate and post collateral for their cleared IR swaps.[30]

131.    TeraExchange spent millions of dollars developing its platform. It launched in 2011 with a robust offering that was, along with other SEFs, "poised to take business from the big banks that have dominated swaps trading."[31]

132.    TeraExchange focused on attracting non-traditional liquidity providers to make markets on the platform, including buy-side entities and second-tier swap dealers. TeraExchange knew these entities could provide sufficient initial liquidity for the platform to launch, even without the Dealer Defendants. It believed that once trading on the platform began, other buy-side entities would join the platform to take advantage of the tighter bid/ask spreads, increased liquidity, and ease of execution available on an order book. TeraExchange was confident that buy-side entities, seeing the advantages of trading on its CLOB, would demand that swap dealers trade with them on the platform, rather than OTC or on an RFQ platform. TeraExchange believed that swap dealers, having no legitimate reason to refuse to utilize the platform, would follow, bringing their own liquidity. Indeed, this is what would have occurred in a competitive market, but that is not what happened.

---

[29] TERAEXCHANGE, http://www.teraexchange.com/teraexchange.html.

[30] *See TeraExchange Connects to CME Clearing to Provide Margin Relief to Customers Trading Interest Rate Swaps, Eurodollar and Treasury Futures*, PR NEWSWIRE, June 25, 2013, http://www.prnewswire.com/news-releases/teraexchange-connects-to-cme-clearing-to-provide-margin-relief-to-customers-trading-interest-rate-swaps-eurodollar-and-treasury-futures-212928021.html.

[31] Matthew Leising, *A Safer Way to Trade Interest Rate Swaps*, BLOOMBERG, Feb. 27, 2014, http://www.bloomberg.com/bw/articles/2014-02-27/interest-rate-swaps-trading-comes-out-of-the-shadows.

133.    TeraExchange brought its CLOB online in 2011. Despite the fact that a number of the Dealer Defendants initially voiced support for TeraExchange's CLOB, they quickly recognized that TeraExchange's CLOB would enable alternative liquidity providers to directly compete with them for business.

134.    To undermine the platform, many Dealer Defendants' FCMs simply refused to clear trades executed on TeraExchange for any of their clients, despite clearing trades for those same clients on other SEFs. By refusing to clear trades from TeraExchange, the Dealer Defendants effectively kept their buy-side clients from trading on the platform.

135.    TeraExchange obtained temporary registration as an SEF in June 2013, causing the Dealer Defendants to be more vocal in their opposition. As a result, many buy-side entities became concerned about meeting with TeraExchange for fear of reprisal from their FCMs.

136.    Throughout this period, these FCMs were clearing trades for the same buy-side firms on Bloomberg and Tradeweb. Again, there is no legitimate reason that an FCM should discriminate among SEFs because its risk comes from its own customer (*i.e.*, the entity seeking to enter the IR swap), not the platform on which the trade is executed. The FCM earns a commission on every trade it clears.

137.    Absent Defendants' conspiracy, these end users could have simply found another FCM to clear for them. But the Dealer Defendants coordinated their activities and collectively made it clear to the buy-side that they would refuse to deal with any firm they caught trading on TeraExchange.

138.    The Dealer Defendants also collectively boycotted TeraExchange, starving it of the liquidity it needed to succeed after losing—to threats—buy-side liquidity. Absent the Dealer

Defendants' anticompetitive boycott, buy-side firms and other liquidity providers would have traded on TeraExchange's platform.

139.   Facing a boycott from the Dealer Defendants and knowing it had no chance of success, TeraExchange has left the IR swaps market. TeraExchange "announced on Feb. 27 [2015] that it was shifting its focus to bitcoin derivatives."[32]

### C.   The Dealer Defendants Boycotted TrueEX

140.   In 2013, TrueEX sought to bring to market an SEF offering an IR swaps exchange-like trading platform open to both buy- and sell-side entities. TrueEX was founded by Sunil Hirani, who had previously started and operated a successful electronic trading platform for credit default swaps for an IDB called Creditex.

141.   TrueEX was the "first swaps exchange to be approved by the [CFTC]."[33] It offered "trading features, such as anonymous trading, that regulators and traders at funds say will encourage smaller banks and other players, such as hedge funds, to enter the market as dealers [which] will help increase competition, reduce prices for customers, and decrease risk in derivatives markets."[34] TrueEX "took a very old way of executing and brought it into the 21st century," which allows a trader to "execute a portfolio of swaps electronically in a very efficient manner."[35]

142.   With these attractive features, and Mr. Hirani's background in electronic CDS trading, TrueEX was ready and able to become a successful all-to-all trading platform for IR

---

[32] Levinson, *supra* note 1.

[33] Glen Fest, *TrueEX Takes Early Lead in Building Rate Swaps Exchange*, AM. BANKER, Apr. 1, 2013, http://www.americanbanker.com/magazine/123_4/Swaps-Sequel-1057473-1.html.

[34] Levinson, *supra* note 1.

[35] Aaron Timms, *TrueEx Builds Bridges in the New World of Swaps*, INSTITUTIONAL INV'R., July 21, 2015, http://www.institutionalinvestor.com/article/3472545/asset-management-regulation/trueex-builds-bridges-in-the-new-world-of-swaps.html#.Vk5RPk3ltaQ.

swaps. Mr. Hirani publicly stated that the platform had signed up sixty-two buy-side participants, explaining that "[c]learly the buyside demand is there."[36]

143.    But "[m]any of the top derivatives dealers, including Goldman Sachs, Deutsche Bank, Citigroup, Barclays, Bank of America Corp, and Morgan Stanley, have declined to use [T]rueEX," stonewalling the trading platform.[37] The Dealer Defendants collectively blocked TrueEX from becoming a successful exchange-like trading platform for IR swaps.

144.    Today, TrueEX, like Javelin and TeraExchange, facilitates few trades in the IR swaps market.[38] And the vast majority of trades that are conducted through TrueEX are conducted only on its RFQ platform, on a name-disclosed basis.[39] Most of those trades are in actuality "compression" trades—which merely consolidate multiple offsetting trades into one position—done to reduce the overall number of trades in a firm's portfolio and to simplify its balance sheet. No bid/ask spread is associated with "compression" trades, so TrueEX's execution of those trades does not threaten the Dealer Defendants in the marketplace. Thus, the Dealer Defendants have effectively neutralized TrueEX from becoming a competitive threat.

## V.    The Dealer Defendants Punish Buy-Side Investors Who Engage in Exchange-Trading

145.    The Dealer Defendants have also conspired to block exchange trading of IR swaps by discouraging their customers from using exchanges or exchange-like trading platforms. The Dealer Defendants have withheld services (including clearing services) to their buy-side customers who attempt to trade on anonymous all-to-all SEFs, they have insisted on post-trade

---

[36] Levinson, *supra* note 1.

[37] *Id.*

[38] Timms, *supra* note 35.

[39] *See* Ivy Schmerken, *Start-Up SEF Taking the Fight to Incumbents*, Tᴀʙʙ Fᴏʀᴜᴍ, Feb. 26, 2015, http://tabbforum.com/opinions/start-up-sef-taking-the-fight-to-incumbents?print _preview=true&single=true.

disclosure practices to discourage exchange-like trading, and they have imposed certain penalties against their customers in an attempt to discourage future transgressions.

146.    These acts, which the Dealer Defendants have done in concert, are designed to make exchange trading unattractive to customers and, in some cases, to scare them from attempting to disrupt the OTC market. "[T]his meaningfully disincentives [dealer-to-client] SEFs from making any changes that may receive retaliation from the biggest dealer banks. As a result, there is little opportunity for 'organic' market evolution to occur in such a deeply anti-competitive marketplace."[40]

### A.    The Dealer Defendants Used "Name Give-Up" to Deter Buy-Side Participation on Exchanges

147.    The Dealer Defendants have agreed to collectively insist on "name give-up" in order to discourage buy-side participation on exchange trading platforms, like SEF CLOBs. Name give-up refers to the practice of identifying the name of each party to an IR swap to the other party. Name give-up serves as a policing mechanism because it allows the Dealer Defendants to determine which trading platforms are abiding by the Dealer Defendants' unwritten rules.

148.    Industry groups have said that the practice of name give-ups hinders the adoption of interdealer broker swap execution facilities by buy-side firms. "As long as post-trade name disclosure is allowed to continue on IDB SEFs for anonymously executed, cleared swaps, otherwise eligible buy-side participants will continue to be deterred from participating in these markets, and the two-tier swaps market will persist."[41]

---

[40] Kelleher, *et al.*, *supra* note 16, at 12.

[41] Steve Marlin, *Buy Side Seeks End to SEF Name Give-Up*, MARKETSMEDIA, April 7, 2015, http://marketsmedia.com/buy-side-seeks-end-to-sef-name-give-up/.

149.     There is no reason for name give-up's continued existence in the IR swaps market. Name give-up is a historical artifact, and, because IR swap trades conducted on SEFs are now centrally cleared, there is no legitimate justification for maintaining the practice on SEFs.

150.     But, pursuant to their agreement, the Dealer Defendants collectively boycotted any trading platform that refused to include name give-up as a feature.

151.     As a result of collective pressure from the Dealer Defendants, numerous SEFs have agreed to impose name give-up on their platforms. In fact, name give-up occurs as a routine practice on IDB SEFs. When a swap trade is executed by voice brokerage, the IDB typically discloses by telephone to each transacting party the name of the other party to the trade. When the swap is executed electronically, the IDB typically sends an on-screen execution message to each transacting counterparty that discloses the name of the other party to the trade.[42] This practice effectively prevents buy-side entities from trading on them.

152.     As a direct consequence of maintaining name give-up, "[t]o date, volumes on the few order-book platforms built by SEFs have been underwhelming to the point of invisibility."[43]

153.     Name give-up also serves as an effective roadblock to all-to-all trading by forcing the end user to reveal its trading positions, and thus elements of its trading strategies, to both dealers and other end users, which may be able to exploit that information against them. "[Name give-up] deters buy-side firms from trading on IDB SEFs because it reveals a firm's private trading positions and proprietary trading strategies to competitors or dealers."[44]

154.     Paul Hamill, formerly employed by UBS and currently the Global Head of Fixed Income, Currencies, and Commodities for Execution Services at Citadel, echoed this sentiment,

---

[42] *Id.*

[43] Timms, *supra* note 35.

[44] Marlin, *supra* note 41.

stating that exchanges without anonymity "can arguably be seen as a disincentive for customers to put liquidity into the platform."[45]

## B.   The Dealer Defendants Collectively Refuse to Clear Trades from Javelin, TeraExchange, and TrueEx

155.   Clearing serves an important risk-mitigation function. As a result, denial of clearing services is a potent weapon that the Dealer Defendants have in their arsenal, and they have jointly deployed it against all-to-all anonymous SEFs—including Javelin, TeraExchange, and TrueEx—with devastating results.

156.   In the OTC market, counterparties face each other directly, meaning they bear the full risk of loss if their counterparty defaults. For IR swaps with high notional values and long tenors, the effect of a counterparty default can be severe, amounting to millions of dollars in losses on an individual trade.

157.   Clearing resolves this problem. For cleared transactions, a clearinghouse acts as an intermediary between the counterparties and effectively guarantees their performance, greatly reducing counterparty risk. In order to remain safe, clearinghouses add an additional layer of protection, in that they only transact directly with a limited number of counterparties known as "clearing members," which must contribute large amounts of capital to the clearinghouse's default (or "guaranty") fund. For example, CME requires clearing members to hold $50,000,000 in capital and contribute at least $15,000,000 in cash to its guaranty fund in order to clear IR swaps.[46] This ensures that a clearinghouse can in all likelihood withstand the default of one of its members.

---

[45] Terry Flanagan, *SEFs Win Qualified Praise*, MARKETSMEDIA, Oct. 8, 2013, http://marketsmedia.com/sefs-win-qualified-praise/.

[46] *See* CME GROUP, *Summary of Requirements for CME, CBOT, NYMEX and COMEX Clearing Membership and OTC Derivatives Clearing Membership* (Apr. 2016),

*(continued . . . )*

158.    The Dealer Defendants collectively agreed that they would not clear trades conducted on all-to-all anonymous SEFs such as Javelin, TeraExchange, and TrueEx.[47] For example, the Dealer Defendants denied their clearing customers the credit limits necessary to trade on SEFs unless they acquiesced to the dealers' demands.[48]

159.    At the same time, the Dealer Defendants routinely clear trades executed on co-conspirator Tradeweb's SEF, and other platforms that they do not view as threats to the bifurcated market. The Dealer Defendants' FCMs thus use their gatekeeping roles to steer business away from all-to-all anonymous SEFs and towards their co-conspirators and other, compliant, RFQ-only platforms as a reward for playing by their rules.

160.    The Dealer Defendants' ability to block clearing has blocked market entry for all-to-all anonymous SEFs. Without access to clearing, buy-side firms cannot trade on such platforms and are forced to trade on dealer-friendly SEFs like Tradeweb that retain the basic, inefficient structure of the OTC market.

## VI.    The Dealer Defendants Collectively Prevented Clearinghouses from Bringing Exchange Trading to the Market

161.    Even though the Dealer Defendants effectively neutralized the most imminent threat to their IR swaps trading profits—exchange or exchange-like trading via Tradeweb, IDBs, or SEFs—they were not finished. To ensure their complete dominance over the IR swaps market, they also boycotted any clearinghouse that might open the door to exchange trading.

162.    As noted above, because, as a result of central clearing, there is no longer counterparty risk, there is no longer any necessity to know the identity of the counterparty to an

---

*( . . . continued)*
https://www.cmegroup.com/company/membership/files/Summary-of-CMEG-Clearing-Membership-Requirements.pdf.

[47] *See* Kelleher, *et al.*, *supra* note 15, at 12.

[48] *Id.*

IR swaps trade. As a clearinghouse could easily evolve into an exchange or a SEF, threatening disintermediation and profit loss, the Dealer Defendants collectively gained control over, or boycotted and disciplined, any clearinghouse that they saw as a threat to their bifurcation of the IR swaps market. As a JPMorgan report stated: "the main concern for the Investment Banking industry is that clearing is the first step leading to exchange/SEF trading for OTC products."[49] The Dealer Defendants perceived clearinghouses "as representing the thin end of a wedge that would end with contracts being put on exchanges for trading."[50]

163.    On July 24, 2006, the CME acquired Swapstream, a London-based multilateral electronic trading platform for IR swaps. At that time, Swapstream supported electronic trading of Euro and Swiss Franc denominated medium- and long-term IR swaps contracts. The CME publicly announced that "the first order of business . . . is to broaden the product base. The CME plans to roll out dollar denominated swaps on Swapstream by the first quarter of 2007 and eventually follow with swaps on additional currencies," meaning that it planned to enter the U.S. market.[51]

164.    In July 2007, the CME announced its plans to offer the market a cleared IR swaps product, including IR swaps denominated in U.S. dollars, through Swapstream starting in the first quarter of 2008.

165.    The CME is a threat to the Dealer Defendants because, as an established exchange, it had the potential to offer integrated exchange trading and central clearing of IR

---

[49] J.P. Morgan Cazenove, (Kian Abouhossein and Delphine Lee), *Global Investment Banks: Investment Banking Wallet Outlook — All Eyes on Equity Derivatives*, GLOBAL EQUITY RESEARCH, at 63 (Sept. 8, 2010).

[50] Peter Norman, THE RISK CONTROLLERS: CENTRAL COUNTERPARTY CLEARING IN GLOBALISED FINANCIAL MARKETS 302 (2011).

[51] Daniel P. Collins, *CME Acquires Swapstream*, FUTURES MAGAZINE, July 24, 2006, http://www.futuresmag.com/2006/07/24/cme-aquires-swapstream.

swaps. In fact, the CME stated in July 2007 that "CME Swaps on Swapstream combines unparalleled direct, anonymous access to high-volume customer groups through Swapstream's platforms, with the regulatory protection and risk management previously only available with exchange-traded products."[52]

166.    The threat to the Dealer Defendants was compounded on February 4, 2008, when the CME announced that 33 buy-side participants had committed to an Early Adopter Program for CME Swaps on Swapstream.[53] The new participants included banks, mortgage banks, asset managers, hedge funds, and proprietary trading firms.

167.    The Dealer Defendants, as part of their conspiracy to extinguish any threats from clearinghouses, collectively boycotted Swapstream. They instead jointly committed to clear IR swaps transactions only through the clearinghouse they knew they could control—LCH.Clearnet. They also used their market power and influence to prevent other sell-side banks and IDBs from dealing with Swapstream.[54] Because the Dealer Defendants jointly agreed to refuse to deal with Swapstream, the platform never launched.[55]

168.    As a result of the Dealer Defendants' concerted action and agreements to refuse to deal with Swapstream and the other conduct alleged herein, the Dealer Defendants again blocked the emergence of electronic CLOB trading of IR swaps.

---

[52] CME GROUP, *CME Swaps on Swapstream to be the First Centrally Cleared Interest Rate Swaps Available to All OTC Market Participants* (July 17, 2007), http://investor.cmegroup.com/investor-relations/releasedetail.cfm?ReleaseID=254515.

[53] *Swapstream Announces 33 Participants for CME Swaps on Swapstream, the First Centrally Cleared Interest Rate Swap*, PR NEWSWIRE, Feb. 4, 2008, http://www.prnewswire.com/news-releases/swapstream-announces-33-participants-for-cme-swaps-on-swapstream-the-first-centrally-cleared-interest-rate-swap-56784472.html.

[54] E. Paul Rowady, Jr., *OTC Interest Rate Swaps and Beyond: The Path to Electronic Markets*, DERIVALERT, Jan. 2010, https://cdn2.hubspot.net/hub/75625/file-15533740-pdf/docs/otc_interest_rate_swaps_and_beyond_-_the_path_to_electronic_markets.pdf.

[55] *Id.*

### ABSENT A CONSPIRACY, THE INTEREST RATE SWAPS MARKET WOULD BE FAR MORE COMPETITIVE FOR THE BUY-SIDE

### I.     The Dealer Defendants Have Substantial Market Power

169.    Currently, the Dealer Defendants continue to account for most IR swaps dealing, and continue to earn extraordinary profits in their OTC-like trading with the buy-side in IR swaps trades. As a result of the conspiracy, it is virtually impossible for a class member to trade directly with another buy-side class member. The Dealer Defendants, therefore, still participate in nearly the entirety of IR swaps transactions with end users.

### II.     Defendants' Conspiracy Has Imposed Significant Harm on Buy-Side Investors

170.    The Dealer Defendants have colluded to maintain an artificial bifurcation of the IR swaps market (between a "wholesale" dealer side of the market and a "retail" end-user side of the market) up to the present day. Although the interdealer IR swaps market came to be traded on exchange-like platforms, the Dealer Defendants had a common interest in relegating the buy-side to the functional equivalent of OTC, so as to ensure that the Dealer Defendants would continue to enjoy huge profits. This bifurcation is wholly artificial.

171.    The Dealer Defendants recognized that with the emergence of all-to-all platforms, buy-side entities would be able to trade directly with one another, thereby disintermediating the Dealer Defendants and denying them the substantial profits they were deriving from intermediating trades in the OTC market.[56] The Dealer Defendants also knew that all-to-all anonymous trading of IR swaps would bring more direct price competition between more entities, thereby leading to the tightening of bid-ask spreads. All-to-all anonymous exchange-like trading would also encourage alternative providers of liquidity to enter the market in competition

---

[56] *See, e.g.*, Adam Sussman, *US Interest Rate Swap Futures: Why Market Participants Would Switch*, TABB GROUP (2012), http://www.cmegroup.com/education/files/tabb-strong-prospects-for-interest-rate-swap-futures.pdf.

against the traditional market makers such as the Dealer Defendants, yielding further spread compression.

172.    There can be no doubt that this is exactly what would have happened absent Defendants' conspiracy. As noted by a recent report:

> In a free market populated by competitive, profit-maximizing dealers and price conscious customers, it would not make sense to expect otherwise. The margins from making markets in such a liquid marketplace with still sizable bid/offer[] spreads to capture would surely be attractive to many market participants outside the few traditional incumbent swaps dealers. As risk-reduction mechanisms, such as netting, compression, and clearing, became easier and more prevalent, the attendant counterparty risks and balance sheet usage declined sharply year after year, further reducing barriers to entry. There is no question that other derivatives market participants wanted to be dealers in this market, and were actively — seemingly unlawfully — kept out.[57]

173.    The Report further stated that "there is little doubt in our minds that dealers want to preserve the traditional swaps market for as long as possible."[58]

174.    Indeed, as explained in a recent report by the Bank for International Settlements, anonymous, all-to-all trading has had precisely this impact on *inter-dealer* fixed income markets, similar to IR swaps : "Electronification of trading platforms is often associated with increased competition over price, which ensures low transaction costs (at least for small tickets). A centralised trading platform can bring together a large set of traders with opposing trading interests, reducing search frictions and raising competition to fill an order."[59]

175.    In sum, if exchange-like features had been made available in a truly competitive marketplace—*i.e.*, one where Defendants were not colluding—there would have been a rapid

---

[57] Kelleher, *et al.*, *supra* note 16, at 2.

[58] *Id.*

[59] *See* BANK FOR INT'L SETTLEMENTS, *supra* note 5, at 23.

migration of IR swaps onto those platforms which, in turn, would have led to a significant tightening of bid/ask spreads paid by the buy-side.

176.    There is expert consensus, based on numerous studies of historical examples, that standardization, migration to anonymous all-to-all trading, and spread compression is a natural progression of financial products. For instance, the introduction of electronic trading to equity options and currency markets has had a major impact on spreads and the costs associated with trading in those markets.

177.    In 1973, for example, the Chicago Board Options Exchange introduced exchange trading for equity options, which had been until that point traded entirely OTC. Eventually, the increased competition introduced by exchange trading tightened spreads drastically. Similar results were found in both the equity and commodities markets, with the advent of anonymous, all-to-all exchange-trading.

178.    But for Defendants' anticompetitive acts, Plaintiff and Class Members would have similarly traded IR swaps on electronic platforms, with far greater transparency and substantially reduced bid/ask spreads than they experience in the functional equivalent of the OTC IR swaps market controlled by the Dealer Defendants. Indeed, one recent study has shown that even with the introduction of SEFs to the IR swaps market, bid-ask spreads for these instruments have barely moved. As the chart below demonstrates, the average bid-ask spreads for 10-year IR swaps are roughly the same before and after the introduction of SEFs.



Average 10-year IRS Bid-Ask Spread Adjusted by Market Volatility

179.     As a result of the Dealer Defendants' efforts, the SEFs that have been successful are either controlled by the Dealer Defendants (Tradeweb), have explicitly entered into an unlawful agreement not to compete with the Dealer Defendants and breach the artificial market division (ICAP), or have recognized that the only way to avoid retaliation from the Dealer Defendants is to focus on providing an RFQ platform (Bloomberg).

180.     As a result of Defendants' collusion, the Dealer Defendants trade among and between themselves on state-of-the art, electronic, exchange-like platforms where they enjoy efficient execution, price transparency, and direct competition, while buy-side entities are restricted to the functional equivalent of the antiquated OTC market where they must transact with dealers and operate at material price and informational disadvantages.

III.    **Absent Collective Action, It Would Have Been Economically Rational for Individual Defendants to Support Structural Changes**

181.    Absent a conspiracy, it would have been in the individual interest of many different market participants—including IDBs, clearinghouses, and SEFs—to offer all-to-all trading platform solutions to the buy-side. Instead, because of Defendants' conspiracy, the SEFs that have tried to offer such platforms have been put out of business, and SEFs like Tradeweb that replicate the structure of the OTC market have remained successful. Without the Defendants' collusion, offerings such as those by Javelin, TeraExchange, and TrueEX would have generated large new revenue streams through increased volume and market share.

182.    Absent a conspiracy, it would be economically rational for an SEF like Tradeweb to offer a fully anonymous order book trading platform for IR swaps that is open to the buy-side, or for an IDB to open its platform to the buy-side. This would enable them to attract a greater volume of IR swaps trades and earn higher revenues. But, due to the Dealer Defendants' conspiracy, not a single all-to-all anonymous SEF open to the buy-side currently does any meaningful business in the IR swaps market.

183.    Absent a conspiracy, it also would have been in the individual interest of many Dealer Defendants to support such a change. Absent a conspiracy, evolution to an exchange or any type of order book would have been inevitable—it is the natural progression when financial products become, as most IR swaps have long been, highly standardized, high-volume products. This is particularly true where, as here, solution providers were actively entering the market to make this happen in response to strong buy-side demand. Given its inevitability, each Dealer Defendant, absent coordination, should have been looking out for its own self-interest—which would have been to partner with a solution provider in order to "get in on the ground floor," increasing its own market share and positioning itself for a fully competitive IR swaps market.

184.    Absent a conspiracy, an individual Dealer Defendant could increase its own market share by providing a more favorable trading experience to the buy-side in the form of fully anonymous order-book trading, as clients shifted their trades away from other dealers onto the trading platform. Additionally, an individual Dealer Defendant could have obtained an equity share in the trading platform, allowing it to share in the profits of the platform. Even leaving aside the potential to be an industry leader and gain first-mover advantage, each Dealer Defendant would have an independent interest in trading on the new platforms and providing clearing services, all of which could have been a profitable source of income. Because no individual Dealer Defendant could prevent exchanges from flourishing, the only way to overcome each Dealer Defendant's individual economic self-interest in participation was to coordinate a united front that could prevent the emergence of exchanges.

185.    Absent a conspiracy to punish them for doing so, it would have been in the self-interest of buy-side members to support, and flock to, the resulting all-to-all platforms that promised to keep their anonymity while also compressing bid/ask spreads due to increased competition and transparency, and the opportunity to trade with market participants other than the major dealers.

186.    However, the Dealer Defendants collectively blocked the market's evolution. Only a conspiracy that gave each Dealer Defendant an assurance that all-to-all trading was not going to happen explains why no Dealer Defendant seized on the opportunity to profit by being the one in the lead when the inevitable change came, and why no other solution provider has stepped into the resulting void.

187.    Defendants' agreements were *per se* illegal agreements to thwart competition among horizontal competitors. The Dealer Defendants' collective refusals to deal with those

SEFs, end users, and other entities that would not go along with their scheme amounted to group boycotts that are illegal under the antitrust laws.

188.    With respect to IR swaps, the Dealer Defendants used their market power to enforce a division between the interdealer and the dealer-to-client markets. The effect of the Dealer Defendants' anticompetitive agreements (such as with each other, IDBs, clearinghouses, and certain SEFs) and collective refusals to deal (with similar platforms that did not go along with the scheme) was to maintain the divided market structure where the buy-side was limited to trades with dealers, and to deny buy-side firms access to interdealer trading platforms or other opportunities to trade through an exchange-like platform. All class members were harmed by these illegal acts because they were all deprived of the opportunity to transact IR swaps at tighter bid/ask spreads.

## IV.    Investigations and Litigation Concerning the Credit Default Swaps Market Show that the Dealer Defendants Colluded to Block Exchange Trading

189.    The Dealer Defendants also abused their collective influence over the market's infrastructure to preserve their supracompetitive in other derivatives markets. Specifically, the Dealer Defendants' strategy here parallels their unlawful conduct in the credit default swaps ("CDS") market. CDS is, in effect, a form of insurance against nonpayment of an underlying debt (*e.g.*, bond or loan) by a specified entity. The protection (insurance) seller promises to pay the protection (insurance) buyer in the event of a predefined default event by the bond or loan issuer. In return, the protection buyer pays a regular fixed payment (or premium) for the duration of the protection period, or up to a default event.

190.    In 2008, some prominent buy-side market participants formed a joint venture that would have brought central counterparty clearing and exchange trading to the CDS market, replacing the existing inefficient, opaque and Defendant Dealer-controlled OTC trading system.

- 49 -

Exchange-based trading would have benefited the CDS market by increasing the number of market participants, reducing transaction costs and offering true price transparency. A central clearinghouse would have benefited the CDS market by reducing counterparty risk inherent in the bilateral OTC trading system and paving the way for CDS exchange trading.

191.     In a strikingly similar pattern to the Dealer Defendants' conduct in the IR swaps market, those same dealers were alleged to have stymied the development of exchange trading for CDS contracts by: (1) boycotting nascent exchange-like platforms for CDS; (2) delaying necessary licensing negotiations to hinder its launch in order to create and launch their own clearing platform; and (3) depriving the competing clearinghouse of any independent influence it might exert in the CDS market by becoming members and seeking to control its operations.

192.     Several class actions were filed against these same Dealer Defendants, and others, alleging that they conspired to block the development of exchange trading of CDS to maintain supracompetitive spreads on CDS transactions with buy-side customers. The Dealer Defendants recently settled these class actions for nearly $1.9 billion.

## CLASS ALLEGATIONS

193.     Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking relief on behalf of the following class (the "Class"):

> All persons or entities who entered into fixed-for-floating IR swaps directly with the Dealer Defendants in the United States from at least as early as January 1, 2008 through the present (the "Class Period").

> Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States Government.

194.    Plaintiff believes that there are thousands of Class Members, making the Class so numerous and geographically dispersed that joinder of all Class Members is impracticable.

195.    There are questions of law and fact common to the Class that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)    Whether Defendants engaged in a conspiracy to block the development of exchange-traded platforms for the trading of IR swaps in order to manipulate the prices for IR swaps in violation of the Sherman Act;

(b)    The identity of the participants in the conspiracy;

(c)    The duration of the conspiracy;

(d)    The nature and character of the acts performed by Defendants in furtherance of the conspiracy;

(e)    Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Class;

(f)    Whether Defendants fraudulently concealed the conspiracy's existence from Plaintiff and the Class;

(g)    The appropriate injunctive and equitable relief for the Class; and

(h)    The appropriate measure of damages sustained by Plaintiff and the Class.

196.    Plaintiff's claims are typical of the claims of the other Class Members. Plaintiff and Class Members sustained damages arising out of Defendants' common course of conduct in violation of the law as described in this Complaint. The injuries and damages of each Class Member were directly caused by Defendants' wrongful conduct.

197.    Plaintiff will fairly and adequately protect the interests of Class Members. Plaintiff is an adequate representative of the Class and has no interests adverse to the interests of absent Class Members. Plaintiff has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

198.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications.

199.    The questions of law and fact common to the Class Members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

200.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous, separate individual actions, or repetitive litigation, would entail. The Class is readily definable and is one for which records should exist in the files of Defendants, Class Members, or the public record. Class treatment will also permit the adjudication of relatively small claims by many Class Members who otherwise could not afford to litigate the claims alleged herein, including those for antitrust. This class action presents no difficulties of management that would preclude its maintenance as a class action.

**DEFENDANTS' FRAUDULENTLY CONCEALED THEIR MISCONDUCT**

201.    Defendants concealed their wrongdoing in manipulating the prices of IR swaps sold to investors. Thus, the statutes of limitations relating to the claims for relief alleged below were tolled due both to Defendants' affirmative acts of concealment and the inherently self-concealing nature of their private, unregulated conduct.

202.    Defendants' success in concealing their collusion was facilitated by their tremendous control over the IR swaps market.

203.    Neither Plaintiff nor Class Members knew of Defendants' unlawful and self-concealing manipulative acts and could not have discovered them by the exercise of reasonable due diligence, if at all, until the date of the filing of this Complaint. Plaintiff and the Class also lacked any basis for identifying the wrongdoers or calculating damages before that date.

204.    Reasonable due diligence could not have uncovered the conspiracy because: (1) Defendants' trading positions and trading strategies in the IR swaps market are not publicly available; (2) the bilateral, non-exchange traded nature of IR swaps transactions make observing anticompetitive behavior in that market exceedingly difficult; (3) the highly specialized and esoteric nature of the different aspects of the IR swaps market makes it exceedingly difficult for an ordinary person to assess improprieties; and (4) neither Defendants nor their co-conspirators told Plaintiff or other Class Members that they were conspiring to block the development of exchange-traded platforms for the trading of IR swaps.

205.    Defendants also took active steps to conceal evidence of their misconduct from Plaintiff, the Class, government regulators, and the public by, among other things: (1) holding out their activities in the IR swaps market as good faith market-making conduct; (2) maintaining the secrecy of their scheme; (3) avoiding any discussion in public fora regarding their collusive activities and manipulation of IR swaps prices; and (4) using non-public proprietary electronic communication platforms (*e.g.*, instant messaging, electronic chatrooms, etc.) to coordinate trading strategies.

206.    In addition, Defendants also failed to have the proper internal controls in place to detect misconduct concerning the manipulation of prices of IR swaps. Such internal failures

made it all the more difficult for Plaintiff, the Class, government regulators, and the public to become aware of Defendants' and their co-conspirators' misconduct.

207.     As a result of Defendants' affirmative steps to conceal their improper conduct; their willful decision not to put in place proper controls to detect improper conduct; the self-concealing nature of Defendants' conspiracy; and the resulting lack of public information about material aspects of the conspiracy, collusion, and trading based on nonpublic information, the statutes of limitations was tolled for Plaintiff's claims.

**FIRST CLAIM FOR RELIEF**

**VIOLATION OF 15 U.S.C. § 1**
**CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE**

208.     Plaintiff incorporates the preceding paragraph by reference.

209.     Defendants entered into and engaged in a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

210.     During the Class Period, Defendants entered into an agreement to reduce competition among themselves by collectively boycotting the development of all-to-all exchange-like platforms for the trading of IR swaps, thereby inflating the prices at which Plaintiff and Class Members transacting in IR swaps in the United States and elsewhere.

211.     This conspiracy to boycott the development of all-to-all exchange-like trading platforms for IR swaps caused injury to both Plaintiff and the Class by depriving them of the benefit of competitive IR swaps prices reflecting true market conditions for some period during and following Defendants' unlawful conduct, and thus Plaintiff and the Class received, upon execution of their trades, less in value than they would have received absent Defendants' wrongful conduct.

212.    The conspiracy is a *per se* violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the IR swaps market. There is no legitimate business justification for, or pro-competitive benefits from, Defendants' conduct. Furthermore, any business justification is outweighed by the anticompetitive effects of Defendants' conduct.

213.    As a direct and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiff and the Class have been injured in their business and property throughout the Class Period.

214.    Plaintiff and the Class are entitled to treble damages for the violations of the Sherman Act alleged herein. Plaintiff and the Class are also entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

## SECOND CLAIM FOR RELIEF

## UNJUST ENRICHMENT

215.    Plaintiff incorporates the preceding paragraph by reference.

216.    Because of the acts of Defendants as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiff and the Class.

217.    It would violate established principles of equity and good conscience for Defendants to keep their ill-gotten profits from their conspiracy to boycott the development of all-to-all exchange-like trading platforms for IR swaps.

218.    Plaintiff and Class Members transacted in IR swaps directly with Defendants. By virtue of Defendants' anticompetitive conduct, Plaintiff and Class Members were deprived the benefits of a fair market, free from collusion. Defendants reaped millions of dollar in profits at the expense of Plaintiff and members of the Class as result of their misconduct.

219.    Accordingly, Plaintiff and the Class seek restoration of the monies of which they were unfairly and improperly deprived, as described herein, by way of transactions for the sale or purchase of IR swaps entered into with the Dealer Defendants.

## RELIEF REQUESTED

Plaintiff demands relief as follows:

(A)    That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff is designated as a class representative, and that Plaintiff's counsel is appointed as counsel for the Class;

(B)    That the unlawful conduct alleged in the Complaint be adjudged and decreed to violate Section 1 of the Sherman Act;

(C)    That Defendants are permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint and that the Court direct such other equitable relief as may be appropriate;

(D)    That the Court award Plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest;

(E)    That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

(F)    That the Court directs such further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues triable by a jury.

Dated: June 1, 2016                      Respectfully submitted,

**LABATON SUCHAROW LLP**

/s/ Gregory S. Asciolla
GREGORY S. ASCIOLLA
JAY L. HIMES
DAVID J. GOLDSMITH
KARIN E. GARVEY
ROBIN A. VAN DER MEULEN
MATTHEW J. PEREZ
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
Email:
gasciolla@labaton.com
jhimes@labaton.com
dgoldsmith@labaton.com
kgarvey@labaton.com
rvandermeulen@labaton.com
mperez@labaton.com

**KESSLER TOPAZ MELTZER & CHECK, LLP**

JOSEPH H. MELTZER
TERENCE S. ZIEGLER
KIMBERLY A. JUSTICE
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
jmeltzer@ktmc.com
tziegler@ktmc.com
kjustice@ktmc.com

*Counsel for Plaintiff Genesee County Employees'*
*Retirement System and the Proposed Class*